Dear Mr. Malone:
You have requested an opinion of the Attorney General regarding the Biomedical Research Foundation of Northwest Louisiana ("Foundation"), a non-profit corporation which has been granted tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. You state that in early 1993, the Foundation requested an opinion from this office on the issue of whether the Caddo Parish Commission ("Commission") was authorized to hold an election for the purpose of levying an ad valorem tax to promote economic development through the Foundation.
In Attorney General Opinion No. 93-22, the author concluded that the Commission was authorized to call such an election and to place before the voters the following proposition:
 "Shall the Parish of Caddo, State of Louisiana (the `Parish'), levy a special tax of two (2) mills on all property subject to taxation in the Parish for a period of five (5) years beginning with the year 1993, for the purpose of promoting economic development through the Biomedical Research Foundation of Northwest Louisiana, such economic development including appropriate scientific and education programs and assistance, with the proceeds of said tax to be used for any lawful purpose for which the Parish may expend public funds and which is intended to encourage and assist in the location, development or expansion of industrial, manufacturing, commercial or professional businesses or concerns?"
The tax proposition was approved by the electorate on April 3, 1993. The Commission and the Foundation subsequently entered into a cooperative endeavor agreement in accordance with the recommendations contained in Opinion No. 93-22. The Agreement details the economic development activities to be undertaken by the Foundation.
Central to the Foundation's planned initiatives is the development of a science, research and technology park in Caddo Parish. The anchor tennant for the technology and research park is to be ICON Industrial Controls Corporation ("ICON"). The Foundation and ICON have entered into an agreement whereby the Foundation will provide an interim facility and certain operating expenses for ICON through loans aggregating $3.2 Million over a thirty-month period from the Foundation to ICON. In return, ICON will locate its permanent headquarters and offices, as well as all of its other programs and facilities, in the Foundation's science, research and technology park for a minimum of fifteen years. Furthermore, beginning no later than forty-two months after September, 1994, ICON will repay the Foundation the funds advanced to it, amortized over a seven and one-half year period, at an interest rate of local prime plus one-half percent.
You specifically ask whether the Foundation may loan funds generated by the ad valorem tax to ICON in accordance with the terms of the Agreement between the Foundation and ICON, discussed supra.
This issue must be examined in light of Article VII, Section 14 of the Louisiana Constitution of 1974 which provides, in pertinent part, the following:
 " § Section 14. (A) Prohibited Uses. Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private . . . .
* * *
 (C) Cooperative Endeavors. For a public purpose, the state and its political subdivisions or political corporations may engage in cooperative endeavors with each other, with the United States or its agencies, or with any public or private association, corporation, or individual."
A very comprehensive analysis of the above Section, as it relates to the expenditure and/or use of public funds was undertaken by this office in Attorney General Opinion No. 90-651. As noted therein, the constitutional norm for the lawful use of public funds and property is found in Section 14. As quoted above, Paragraph (A) generally prohibits the loan, pledge, or donation of public funds.
Paragraph (C) of Section 14 authorizes the state and its political subdivisions (i.e., the Commission, through the Foundation), to engage in cooperative endeavors for a public purpose with other governmental agencies, public or private associations and corporations and/or individuals. However, Paragraph (C) merely supplements the prohibition against donations contained in Paragraph (A). It does not create an exemption or exception from the general constitutional norm. In other words, the cooperative endeavor must meet the general standards for the non-gratuitous alienation of public funds established in Paragraph (A). City of Port Allen v.Louisiana Risk Management, et al, 439 So.2d 399 (La. 1983) and Attorney General Opinion No. 90-651.
In City of Port Allen, the Supreme Court ruled:
 "The cases that do exist [under La. Const. Art. IV § 12 (1921)] hold primarily that this section is violated whenever the state or political subdivision seeks to give up something of value when it is under no legal obligation to do so . . . .
* * *
Section 14(C) does not help the state, either. There is no indication that it is meant to be an exception to the rule of § 14(A); the exceptions are clearly contained in § 14(B). Thus, even if political subdivisions cooperate for a public purpose they still may not give away their assets to other political subdivisions, the United States Government, or public or private associations or corporations, or to individuals merely for a `public purpose'." (Emphasis added.)
The threshold requirement of the constitutional doctrine for distinguishing between invalid and lawful expenditures and transfers of public funds and property is the presence of a legal obligation or duty by the transferor to alienate said funds or property. See also Beard-Poulan, Inc. v. Dept. ofHighways, 362 F. Supp. 547 (W.D. La. 1973) and Town ofBrusly v. West Baton Rouge Parish Police Jury, 283 So.2d 288
(La.App. 1st Cir. 1973).
This prerequisite is satisfied by the presence of avalid statute, ordinance, charter or contract. The vehicle by which the obligation is created may, nevertheless, be ultra vires or unconstitutional if it creates no binding legal obligation or if the obligation created is substantially inconsistent with, or beyond the scope of the Commission's authorized duties. Attorney General Opinion No. 90-651.
As noted above, the requirement of a legal duty is the threshold, but not the only predicate for the constitutionality of the expenditure. Second, the expenditure must also be for a public purpose. Third, the expenditure must create a public benefit proportionate to the cost (i.e., the amount expended). Attorney General Opinion Nos. 93-787, 92-722, 92-127 and 90-651.
The legal obligation/duty standard discussed above was applied by the Second Circuit Court of Appeal in James v.Rapides Police Jury, 113 So.2d 88 (La.App. 2nd Cir. 1959). The Court adjudged the constitutionality of the police jury's payment to the Red River Valley Improvement Association, Inc. (Association), a nonprofit corporation chartered for the purpose of promoting and encouraging public interest in the development of the Red River Valley. The Court determined that the police jury had a legal obligation (i.e., statutory duty) to build levees, dikes, drainage canals, etc., and that duty encompassed the hiring of expert services and even the hiring of private organizations to perform the work the jury, itself, was obligated and empowered to undertake. However, the Court determined that the services rendered by the Association constituted public relations services which did not, in fact, build levees. Thus, the expenditure of public funds for that purpose was not within the scope of the statutory duty of the police jury.James makes two other points of importance to this constitutional doctrine. The first is that the worthiness of the recipient and of the actual use of public funds is immaterial to the issue of the constitutionality of the transfer by the public entity. As the Court noted:
 "Though it may be regarded as an unnecessary comment, we think it is appropriate in the instant case to observe that these specific prohibitions have been wisely implanted in our fundamental law, for it is conceivable that without such prohibitions the State, or a political subdivision thereof, might so deplete the public fisc by contributions to almost innumerable worthy private and semi-public enterprises as to seriously impair the necessary expense of conducting more prosaic but more important governmental functions."
In other words, to allow unrestricted expenditures of public funds by any and all political subdivisions, public agencies, entities or officers, as long as those entities or persons can imagine some species of "public good" or "public benefit" resulting therefrom, would be to authorize a fragmentation and incoherence in fiscal policy at all levels of state government. This, Article VII, § 14 seeks to prevent by requiring a valid legal authority (even at the contractual level) for all alienations of public funds. The effect of Article VII, § 14, as interpreted by the Supreme Court and the Attorney General, is to give further constitutional protection and definition to the plenary power of the legislature over the public fisc, and to insure that political subdivisions conform to statewide general fiscal policy rather than formulate it on the basis of local expediency within their own territorial jurisdictions.
The second important statement of James is that custom, as expressed in the doctrine of contemporaneous construction , can not modify or negate the operation of the prohibition of Article VII, Section 14. In James, the police jury had been making these same payments to the Association for approximately ten years. Regardless of how long or how often any governmental entity has transferred funds to others, public or private, the duration and repetition of that practice does not create an exemption to the prohibition of Article VII, Section 14 by either contralegem custom or by the contemporaneous construction doctrine. Past illegality does not justify future illegality. La. Civ. Code Art. 3.
As can be seen from the above, the unequivocal prohibition established by Article VII, Section 14 constitutes one of the most enduring and formally consistent constitutional provisions in Louisiana law. Further, it has been consistently recognized and upheld by this office. Attorney General Opinion Nos. 94-515, 93-787, 93-766, 93-665, 93-558, 92-494, 91-104, 90-652, 89-180 and 84-871.
The initial issue to be determined regarding the loan, in question, is whether a valid legal duty or obligation exists for the Commission through the Foundation, to alienate its funds for this purpose. As previously noted in Opinion No. 93-22, the Commission has the power and authority to engage in economic and/or industrial development. The Louisiana Legislature has confirmed that this authority as essential to the economic growth of this state through various legislatively enacted economic and/or industrial development programs, including those evidenced by R.S. 33:130.52, 33:9020, et seq., 51:1151,et seq. and 51:1201. We note specifically the provisions of R.S. 33:9020 referred to as the "Cooperative Economic Development Law." Section 9021 expresses the legislative finding and declaration of necessity that local governmental subdivisions engage in cooperative endeavors with each other and with other public or private associations and/or corporations for the purpose of economic development to alleviate the conditions of unemployment, underemployment and other forms of economic distress. To accomplish this result, Section 9023 authorizes local governmental subdivisions to create non-profit economic development corporations with which public bodies may engage in cooperative endeavors, pursuant to Section 9031.
Section 9022 defines "cooperative endeavors" to mean any form of economic development assistance between the state, its local governmental subdivisions and/or private associations, corporations, individuals, etc. Section 9022 further provides:
 "The term `cooperative endeavors' shall include but not be limited to cooperative financing, cooperative development, or any other form of cooperative economic development activity." (Emphasis added.)
Section 9022 further defines "cooperative financing" to mean:
 ". . . any method of financing an economic development project between and among the state, its local governmental subdivisions, political corporations, public benefit corporations, the United States or its agencies, or any public or private association, corporation, or individual. Said methods shall include loans, loan guarantees, land write-downs, grants, lease guarantees or any form of financial subsidy or incentive." (Emphasis added.)
Finally, Section 9034 authorizes a local governmental subdivision, by resolution or ordinance, to carry out the purposes set forth in the statutory provisions discussed above without the necessity of creating and organizing an economic development corporation.
As can be seen from the above, the Commission (through the Foundation) is vested with broad and sweeping statutory authority to expend public funds to implement plans and programs for economic development. Examples of such projects previously considered by this office are discussed in Attorney General Opinion Nos. 77-1328 (political subdivision is authorized to use general funds to purchase and develop real estate and construct building facilities in an attempt to induce industry into the parish if at the time said funds are to be expended there is a customer legally bound to reimburse the political subdivision for such an outlay of public funds), 78-1258 (city may expend public funds for the financing of loans to local development corporations pursuant to programs designed to provide greater employment opportunities for the needy and expand commerce and industry) and 81-979 (political subdivision may expend public monies for the rehabilitation and renovation of property used for industrial development purposes which will result in the direct or indirect granting of public money to a private profit-motivated enterprise).
Further, the law specifically recognizes, among the various forms of cooperative endeavors available to encourage economic development, that of cooperative financing through loans and loan guarantees between local government or subdivisions, political corporations and public or private associations or corporations. We, therefore, find the presence of a legal obligation or duty (i.e., a valid statute) for the alienation of the funds in question. We further conclude that the alienation is consistent with the purposes for which the tax proceeds may be expended as authorized by the tax proposition, quoted supra. R.S. 39:704.
It is also our opinion that the loan, in question, serves a public purpose. The ICON project will promote economic development in Caddo Parish by encouraging, assisting and enabling ICON to locate and expand its research and manufacturing endeavors in the science, research and technology park being developed by the Foundation. These endeavors will include a state-of-the-art Manufacturing and Robotics Sciences Center (MARS) and other developmental and technological programs. This will obviously result in the creation of badly needed employment opportunities for the citizens of the parish, increase the educational opportunities, broaden the tax base and improve the general overall quality of life. The remaining issue is whether the benefits discussed above to be derived by the public are proportionate to the ultimate cost to be incurred as a result of the loan transaction.
As previously noted, ICON must locate its headquarters and business operations in the Foundation's science, research and technology park. It must continue to conduct its business operations in the park for at least fifteen years. In addition, all of ICON's future development and technology programs and facilities must be located in the park. Finally, ICON must, no later than forty-two months after September, 1994, begin to repay the loan with an interest rate of local prime plus one-half percent.
Given this unique factual scenario, this office is of the opinion that the loan amount, in question, is not so disproportionate to the public benefits to be realized so as to violate the constitutional provisions contained in Article VII, Section 14.
In summary, it is the opinion of this office that the Biomedical Research Foundation of Northwest Louisiana may loan funds derived from an ad valorem tax dedicated to the purpose of promoting an economic development through the Foundation to ICON Industrial Controls Corporation in accordance with the terms and conditions of the above referenced and discussed agreement between the Foundation and ICON and pursuant to the statutory provisions contained in R.S. 33:9020, et seq. Our holding that this transaction does not violate Article VII, Section 14 of the Louisiana Constitution of 1974 and the specific tax proposition, in question, is strictly limited to this transaction and no other. The utilization of the tax revenues for any other purpose must and will be scrutinized on an individual basis. Further, we must emphasize that this opinion is limited to the legality of the agreement between the Foundation and ICON.
Trusting this answers your inquiries, I am
Very truly yours,
 RICHARD P. IEYOUB Attorney General
 By: _______________________ ROBERT E. HARROUN, III Assistant Attorney General